# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| DIANE LAMPREY,               )<br>                              )<br>    Plaintiff,                )<br>                              )<br>        v.                    )<br>                              )   2:16-cv-00570-JDL<br>WELLS FARGO HOME              )<br>MORTGAGE d/b/a AMERICA'S      )<br>SERVICING COMPANY, et al.     )<br>                              )<br>    Defendants.               ) | |

## ORDER ON THE DEFENDANTS' MOTION TO DISMISS

Plaintiff Diane Lamprey filed this lawsuit against Defendants Wells Fargo Home Mortgage d/b/a America's Servicing Company ("ASC") and the Bank of New York Mellon Trust Company, N.A., as successor-in-interest to JP Morgan Chase, N.A., for certificateholders of the Nomura Asset Acceptance Corporation Mortgage Pass-Through Certificates, Alternative Loan Trust Series 2005-AR2 ("Bank of New York"). She alleges that ASC, acting as Bank of New York's agent, unlawfully communicated with her during the pendency of her five-year Chapter 13 bankruptcy proceeding, and again following her bankruptcy discharge, in violation of 11 U.S.C.A. §§ 362(a)(6) and 524(a)(2) (2017). Lamprey also alleges that ASC, acting as Bank of New York's agent, violated the Maine Consumer Credit Code, 9-A M.R.S.A. § 9-403 (2017) (Count Three); the federal Fair Debt Collection Practices Act, 15 U.S.C.A. §§ 1692, *et seq.* (Count Four); and the Maine Fair Debt Collection Practices Act, 32 M.R.S.A. §§ 11001, *et seq.* (Count Five).

The Defendants have moved to dismiss Lamprey's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, I deny the motion.

## I. FACTUAL BACKGROUND

In December 2004, Lamprey and her then-husband executed a $325,000 promissory note secured by a mortgage on their home in Eliot, Maine (the "Property"). Lamprey and her husband divorced in 2007, with Lamprey receiving the sole ownership of the Property. She ceased making mortgage payments in October 2008.

In May 2009, Mortgage Electronic Registration Systems, Inc., as nominee of the original lender, assigned the mortgage and note to defendant Bank of New York.[1] ASC was Bank of New York's loan servicer at all relevant times. Bank of New York initiated foreclosure proceedings in the Maine District Court in June 2009 and received a Judgment of Foreclosure and Sale in August 2010.

Pursuant to 14 M.R.S.A. § 6322 (2017), there was a 90-day redemption period following the foreclosure judgment. In October 2010, with 44 days remaining in the redemption period, Lamprey filed a chapter 13 bankruptcy petition and physically vacated the Property, believing that this was a requirement of the Judgment of Foreclosure and Sale. *See In re Lamprey,* No. 10-21713 (Bankr. D. Me. October 12, 2010). Pursuant to 11 U.S.C.A. § 108(b) (2017), the redemption period was automatically extended by 60 days after Lamprey's bankruptcy petition date, to

---

[1] The assignment of the mortgage and note predates the Law Court's ruling in *Bank of America, NA v. Greenleaf,* 2014 ME 89, 96 A.3d 700.

December 11, 2010. The redemption period expired without the Property being redeemed.

In her Bankruptcy Schedules, Lamprey listed the Property as an asset and identified ASC as a secured creditor. ECF No. 1-5 at 3, 8 (Schedule "A" and Schedule "D"). Her Chapter 13 Plan (the "Plan") was filed later in December and was confirmed by the Bankruptcy Court without objection in January 2011. Five years later, in June 2015, the Bankruptcy Court discharged Lamprey from bankruptcy.

Beginning as early as October 2010 and continuing until September 2016, ASC sent at least 28 letters and notices to Lamprey concerning the Property and the promissory note. These communications form the basis for her claims against the Defendants.

## II. LEGAL STANDARD

For Lamprey to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), her complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted), and must present facts that plausibly suggest Lamprey's right to the relief requested, *see Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The burden of demonstrating that the complaint does not state a claim for which relief can be granted is on the Defendants. *See* 5B Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1357 (3d ed. 2017 Update).

## III. LEGAL ANALYSIS

### A. The Bankruptcy Claims (Counts One and Two)

Lamprey alleges that the Defendants violated the automatic stay, 11 U.S.C.A. § 362(a)(6), and the discharge injunction, 11 U.S.C.A. § 524(a)(2), by communicating with her during the pendency of her bankruptcy and after her discharge from bankruptcy.

"The automatic stay is one of the fundamental protections that the Bankruptcy Code affords to debtors." *Jamo v. Katahdin Fed. Credit Union (In re Jamo),* 283 F.3d 392, 398 (1st Cir. 2002). It "springs into effect upon the filing of a bankruptcy petition," *id.*, prohibiting all creditors' efforts to enforce liens or claims in order to prevent them from acting against property of the debtor or of the estate without leave of the bankruptcy court, *In re SW Boston Hotel Venture, LLC,* 748 F.3d 393, 399 (1st Cir. 2014); *Knowles v. Bayview Loan Svcing, LLC (In re Knowles),* 442 B.R. 150, 160 (B.A.P. 1st Cir. 2011). Although it is "extremely broad in scope," the automatic stay does not prohibit all communication or actions by a creditor to a debtor. *Knowles,* 442 B.R. at 160 (citing King, et al., *Collier on Bankruptcy* ¶ 362.03 (15th ed. rev. 2007)). A communication violates the automatic stay if it is "coercive or harassing" or "immediately or potentially threaten[ ] the debtor's possession of its property." *Id.*

The discharge injunction "is like a permanent extension of the automatic stay." *McConnie Navarro v. DLJ Mort. Capital, Inc. (In re Navarro),* 563 B.R. 127, 141 (Bankr. D.P.R. 2017). It operates as a permanent injunction against the commencement or continuation of an action to collect discharged debts. *Best v. Nationstar Mortgage, LLC (In re Best),* 540 B.R. 1, 8 (B.A.P. 1st Cir. 2015) (quoting

4

11 U.S.C. § 524(a)(2)). Like the automatic stay, under the discharge injunction "contact with the Debtor is not per se prohibited," instead, only "demands for payment of discharged debts are prohibited." *Id.* at 10. A creditor violates the discharge injunction where it has notice of the debtor's discharge, it intends the actions which constituted the violation, and it acts in a coercive or harassing way. *Id.* at 9 (quoting *Lumb v. Cimenian (In re Lumb),* 401 B.R. 1, 6 (B.A.P. 1st Cir. 2009). "Coercion" is assessed under an objective standard, and whether a creditor acted in an objectively coercive manner is determined on the specific facts of each case. *Id.* (quoting *Bates v. CitiMortgage, Inc. (In re Bates),* 517 B.R. 395, 398 (Bankr. D.N.H. 2014)); *see also Pratt v. Gen. Motors Acceptance Co. (In re Pratt),* 462 F.3d 14, 19 (1st Cir. 2006).

The Defendants argue that ASC's written communications to Lamprey did not violate the automatic stay or the discharge injunction because they were sent for informational purposes only and did not actually demand payment from her. Moreover, the Defendants argue, almost all of the written communications contained disclaimers that disclosed, in clear and conspicuous language, that they should not be construed as an attempt to collect a debt. ECF No. 13 at 8 (citing *Best,* 540 B.R. at 11 (letters containing disclaimer did not violate the discharge injunction)).

The record contains several documents that undercut the Defendants' argument. First, in June 2011, and again in June 2013, ASC sent Lamprey notices stating that the interest rate on her mortgage loan had decreased and that the interest-only installment due would be adjusted accordingly. *See* ECF No. 1-9; ECF No. 1-23. The 2011 notice states that "[t]he new total payment . . . **due** on August 01, 2011 is $1,100.02," ECF No. 1-9 (emphasis added), and the 2013 notice states that

"[t]he new total payment . . . ***due*** on August 01, 2013 is $1,420.59," ECF No. 1-23 (emphasis added). Both documents implicate the automatic stay because they were sent and received during the pendency of Lamprey's chapter 13 bankruptcy. Both documents contain the word "due," which is a word that indicates an attempt to collect a debt. *See Lemieux v. Wells Fargo Home Mortgage (In re Lemieux)*, 520 B.R. 361, 366 (Bankr. D. Mass. 2014). Both documents state that a payment in a specified amount is due on a specific date. Neither document contains a disclaimer.

Second, in June 2016, approximately one year after Lamprey was discharged from bankruptcy, ASC sent her a Notice of Default and Right to Cure (the "Notice of Default") stating that "your loan . . . is in default for failure to make timely payments," and threatening to accelerate the now-discharged promissory note. ECF No. 1-58. The notice itemized the past due payments on the note as well as late charges and other fees; stated that Lamprey's "[t]otal [d]elinquency as of June 30, 2016" was $160,254.85; and threatened to accelerate the loan "[i]f funds are not received by August 9, 2016." *Id.* at 1. Because the Notice was sent and received after Lamprey's June 2015 bankruptcy discharge, this document implicates the discharge injunction.

Third, on September 21, 2016, the law firm of Bendett & McHugh, PC, sent Lamprey a letter informing her that it had been retained by ASC.[2] ECF No. 1-67. The letter stated that $473,939.20 was owed on the promissory note and stated further that "unless you, within thirty days after receipt of this notice, dispute the validity of the debt . . . the debt will be assumed to be valid by us." *Id.* at 1 (emphasis

---

[2] The letter states that Bendett & McHugh had been retained by Wells Fargo Home Mortgage, which does business as ASC. *See* ECF No. 1-67.

omitted). The letter continued, "The law firm of Bendett & McHugh, PC is a debt collector and is attempting to collect a debt." *Id*. at 2 (emphasis omitted). Because it was sent and received after Lamprey's June 2015 bankruptcy discharge, this document implicates the discharge injunction.

Fourth, between April 2011 and July 2016, ASC sent Lamprey eleven notices pertaining to a hazard insurance policy that it purchased for the Property in April 2011 and that it renewed periodically thereafter. ECF No. 1-8; ECF No. 1-15; ECF No. 1-19; ECF No. 1-20; ECF No. 1-24; ECF No. 1-28; ECF No. 1-34; ECF No. 1-38; ECF No. 1-52; ECF No. 1-55; ECF No. 1-59. Six of the hazard insurance notices stated that the policy's annual premium was being charged to Lamprey's escrow account. ECF No. 1-8; ECF No. 1-15; ECF No. 1-20; ECF No. 1-28; ECF No. 1-38; ECF No. 1-55. One notice also stated that Lamprey's monthly mortgage payment would be increased to include the cost of the policy, ECF No. 1-8, while another stated that Lamprey would be responsible for the repayment of the premium, ECF No. 1-55. Eight of the hazard insurance notices predated the bankruptcy discharge and therefore implicate the automatic stay. *See* ECF No. 1-8; ECF No. 1-15; ECF No. 1-19; ECF No. 1-20; ECF No. 1-24; ECF No. 1-28; ECF No. 1-34; ECF No. 1-38. Three hazard insurance notices post-dated the bankruptcy discharge and therefore implicate the discharge injunction. *See* ECF No. 1-52; ECF No. 1-55; ECF No. 1-59.

Nine of the hazard insurance notices, the Notice of Default, and the Bendett & McHugh letter contained disclaimers which state in pertinent part that if the recipient had received a discharge in a bankruptcy case, then the communication was merely being provided for informational purposes only. ECF No. 1-8; ECF No. 1-15;

7

ECF No. 1-19; ECF No. 1-20; ECF No. 1-24; ECF No. 1-28; ECF No. 1-38; ECF No. 1-55; ECF No. 1-58; ECF No. 1-59; ECF No. 1-67. This appears to be a recognition on the part of ASC that any personal obligation on the part of Lamprey to pay debts associated with the mortgage loan and/or the hazard insurance policy were discharged as a result of the bankruptcy discharge.[3] *See Lemieux,* 520 B.R. at 367 (citation omitted). Yet the same notices and letter convey messages that are at odds with the disclaimers. *See id.* As noted above, the Notice of Default refers to the mortgage loan as being "in default for failure to make timely payments," alleges a "[d]elinquency" of $160,254.85, and threatens to accelerate the loan if payment is not received by a specific date. ECF No. 1-58 at 1. Three of the hazard insurance notices contain the words "Action required" on the very first line, ECF No. 1-20; ECF No. 1-28; ECF No. 1-55, and all of the notices refer to Lamprey as being ultimately responsible for repaying the insurance premium, *see* ECF No. ECF No. 1-8; ECF No. 1-15; ECF No. 1-20; ECF No. 1-28; ECF No. 1-55. Also, the Bendett & McHugh letter states that the law firm was retained by Wells Fargo Home Mortgage and, in all capital letters, that is a debt collector and is attempting to collect a debt, a statement which is directly at odds with the disclaimer. *See* ECF No. 1-67.

Based upon these documents, I conclude that Lamprey has stated facially plausible claims for violation of the automatic stay pursuant to 11 U.S.C.A. § 362(a)(6) and the discharge injunction pursuant to 11 U.S.C.A. § 524(a)(2). Therefore, the Defendants' motion to dismiss is denied as to Counts One and Two.

---

[3] None of the disclaimers refer to the automatic stay or disclaim responsibility for attempting to collect a debt during the pendency of Lamprey's bankruptcy.

## B. Other Claims (Counts Three, Four, and Five)

The Defendants argue that Lamprey's claims for violation of the Maine Consumer Credit Code, 9-A M.R.S.A. § 9-403, (Count Three) and the federal and Maine Fair Debt Collection Practices Acts, 15 U.S.C.A. §§ 1692, *et seq.*; 32 M.R.S.A. §§ 11001, *et seq.* (Counts Four and Five)[4] should be dismissed under the doctrine of res judicata; that her state law claims (Counts Three and Five) should be dismissed under the doctrine of conflict preemption and field preemption; and that her federal Fair Debt Collection Practices Act claim (Count Four) should be governed solely by the Bankruptcy Court's contempt power.

### (1) Res Judicata

Lamprey argues that all of her rights and obligations in the Property were extinguished at the end of the foreclosure redemption period pursuant to 14 M.R.S.A. § 6323 (2017), and, simultaneously, Bank of New York's security interest was converted into an ownership interest. ECF No. 15 at 10, 12 (citing *In re Simcock,* 152 B.R. 8-9 (Bankr. D. Me. 1993)). Consequently, she claims, the communications from the Defendants to her after the end of the redemption period, when she had no further personal liability on the loan and no further *in rem* liability relating to the Property, amounted to attempts and threats to enforce a right that had been barred by final court orders.

---

[4] The Complaint's allegations of violations of the federal Fair Debt Collection Practices Act and the Maine Fair Debt Collection Practices Act are pleaded together in a single section identified as "COUNTS FOUR AND FIVE." For the sake of clarity, this Order will refer to the federal Fair Debt Collection Practices Act claim as "Count Four" and the Maine Fair Debt Collection Practices Act claim as "Count Five."

9

The Defendants argue that by identifying ASC as a secured creditor in her Bankruptcy Plan, Lamprey represented to the Bankruptcy Court that ASC still held a valid security interest in the Property. Therefore, they claim, because the Bankruptcy Court confirmed the Plan, the doctrine of *res judicata* applies and operates to bar Lamprey from asserting in this action that ASC's security interest in the Property expired at the end of the foreclosure redemption period under state law. ECF No. 13 at 12 (citing *Layo v. First Nat'l Bank of New York (In re Layo)*, 460 F.3d 289, 293-95 (2d Cir. 2006)) (quotation omitted).

ASC's argument mischaracterizes Lamprey's Chapter 13 Plan. A Judgment of Foreclosure and Sale ("Foreclosure Judgment") was entered in the state court proceeding on August 27, 2010. ECF No. 1-2 at 5. Lamprey's Chapter 13 Plan, dated October 15, 2010, identified ASC, Bank of America, and Northeast Credit Union as secured creditors and reported that a foreclosure judgment had been entered against their collateral, the Property. ECF No. 1-6 at 4. The Plan also stated that Lamprey "consents to relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to permit [ASC, Bank of America, and Northeast Credit Union] to enforce their state-law interests against" the collateral. *Id.* at 3. Further, the Plan provided that any resulting deficiency claim "will be treated as unsecured." *Id.* ASC did not object to the Plan and the Plan was confirmed by the Bankruptcy Court on January 11, 2011. ECF No. 1-7.

Thus, under the Plan, the Bankruptcy Estate surrendered the property to ASC, Bank of America, and Northeast Credit Union by releasing their claims from the automatic stay and permitting them to proceed against the Property pursuant to the

Foreclosure Judgment. *See* ECF No. 1-6. The Plan's characterization of ASC as a secured creditor as of the date of the Plan—October 15, 2010—was accurate because the foreclosure redemption period had not expired as of that date and ASC still held a secured claim against the Bankruptcy Estate.[5] Accordingly, as a consequence of the Bankruptcy Court's Confirmation Order dated January 11, 2011, ASC was left to enforce its "state law interests" established by the Foreclosure Judgment, and it was no longer a secured creditor of the Bankruptcy Estate. Contrary to ASC's argument, the Confirmation Order did not result in a res judicata bar to Lamprey's claims brought under the Maine Consumer Credit Code, 9-A M.R.S.A. § 9-403, and the federal and Maine Fair Debt Collection Practices Acts, 15 U.S.C.A. §§ 1692, *et seq.*; 32 M.R.S.A. §§ 11001, *et seq.*

**(2) Conflict Preemption**

The Defendants claim that §§ 1322(b)(5) and 1322(c) of the Bankruptcy Code, which allow a debtor to repay past due mortgage payments as part of a bankruptcy plan over a three to five year period, give Lamprey a federal-law interest in the Property that conflicts with 14 M.R.S.A. § 6323, which mandates that the mortgagor's interest terminates upon the end of the foreclosure redemption period. Therefore, the Defendants argue that because Maine's foreclosure law is in conflict with the Bankruptcy Code, Counts Three and Five of Lamprey's Complaint are barred by conflict preemption, which occurs "when compliance with both federal and state regulations is a physical impossibility." *Fla. Lime & Avocado Growers, Inc. v. Paul,*

---

[5] By operation of 11 U.S.C.A. § 108(b), the expiration of the redemption period was delayed until 60 days after the date of the Chapter 13 petition, which was filed October 12, 2010. Thus, the redemption period expired December 11, 2010.

11

373 U.S. 132, 142-43 (1963); *see also Friends of Merrymeeting Bay v. Olsen,* 839 F. Supp. 2d 366, 374 (D. Me. 2012). Lamprey argues that there is no conflict because §§ 1322(b)(5) and 1322(c) are only applicable where the debtor has chosen to make use of them, and she did not invoke either section in the Bankruptcy Plan.

The Defendants reply by citing the First Circuit's opinion in *Jamo* for the proposition that the court should focus on the effect of the state foreclosure statute upon the entire Bankruptcy Code and not just upon the provisions that Lamprey actually relied on in her bankruptcy petition. This argument is unpersuasive because, although *Jamo* does state that the Bankruptcy Code should be "read as a whole," *Jamo,* 283 F.3d at 399, the court's decision says nothing about the interplay between state law and federal law, or about § 1322 of the Bankruptcy Code, *id*. Instead, the First Circuit in *Jamo* was concerned with the interplay of different sections of the Bankruptcy Code, such as whether the automatic stay (§ 362(a)(6)) permitted creditors to negotiate reaffirmation agreements (§ 524(c)). *Id*. This case does not concern a reaffirmation agreement, and there is no conflict presented with respect to the Maine statute that governs the right of a mortgagee to sell unredeemed property—14 M.R.S.A. § 6323—and the Bankruptcy Code provisions regarding a debtor's repayment of a mortgage—11 U.S.C.A. §§ 1322(b)(5) and 1322(c)—because Lamprey did not seek to repay ASC's mortgage as part of the Chapter 13 Plan. Therefore, conflict preemption does not bar Counts Three and Five of Lamprey's Complaint.

**(3) Field Preemption**

The Defendants argue that Lamprey's state-law claims are also preempted under the theory of field preemption based upon First Circuit case law which recognizes that "Congress clearly intended to occupy the field [of bankruptcy] to the exclusion of state law," ECF No. 13 at 16 (quoting *Bessette v. Avco Fin. Servs., Inc.,* 230 F.3d 439, 447 (1st Cir. 2000)), and that the Bankruptcy Code preempts "virtually all alternative mechanisms for remedying violations of the Code," *id.* (quoting *Bessette,* 230 F.3d at 447 (emphasis omitted)). Field preemption applies where "the scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947); *see also Friends of Merrymeeting Bay,* 839 F. Supp. 2d at 373.

Both decisions upon which the Defendants rely are readily distinguishable from this case. In *Bessette,* the First Circuit addressed the issue of whether state law remedies for unjust enrichment were preempted by the "congressional intent evidenced in the comprehensive remedial scheme of the Bankruptcy Code." *Bessette,* 230 F.3d at 447 ("[A]n alternative state court remedy for unjust enrichment in these circumstances is inevitably in conflict with Congress's plan that federal courts enforce § 524 through § 105."). The decision does not address the topic of debtors' property interests arising under state law. Likewise, in *Patriot Portfolio v. Weinstein* (*In re Weinstein*)*,* the First Circuit concluded that certain exceptions to the Massachusetts homestead exemption did not apply in bankruptcy and, therefore, a debtor could avoid a creditor's lien under § 522(f) of the Bankruptcy Code. 164 F.3d 677, 679 (1st

13

Cir. 1999). As with *Bessette*, in *Weinstein* the court did not address whether state law provisions that would ordinarily cause Lamprey's rights in the Property to extinguish are somehow preempted by the Bankruptcy Code. Because the Defendants have failed to show that the Bankruptcy Code was explicitly or implicitly intended to "occupy the field" regarding the rights of a creditor secured by a mortgage in real estate, field preemption does not apply. *See Bessette,* 230 F.3d at 447.

**(4) Additional Arguments Presented by the Defendants**

The Defendants argue that Lamprey's claim under the federal Fair Debt Collection Practices Act ("FDCPA") (Count Four) is precluded by the Bankruptcy Code because her allegations arise out of alleged violations of the automatic stay and the discharge injunction and, therefore, her remedy ought to be governed solely by the Bankruptcy Court's contempt power. They contend that to allow Lamprey a private right of action for allegedly improper communications via the FDCPA would circumvent the purpose of the Bankruptcy Code. This argument is unconvincing because the Bankruptcy "Code and the FDCPA are not irreconcilable and creditors are under the obligation to follow both." *Martel v. LVNV Funding, LLC (In re Martel),* 539 B.R. 192, 198 (Bankr. D. Me. 2015); *see also Randolph v. IMBS, Inc.,* 368 F.3d 726, 730 (7th Cir. 2004) (stating that the Bankruptcy Code and the FDCPA "do not . . . add up to irreconcilable conflict; instead the two statutes overlap . . . . It is easy to enforce both statutes, and any debt collector can comply with both simultaneously").

Finally, the Defendants argue that the communications sent to Lamprey would not cause even the most unsophisticated hypothetical consumer to believe that the Defendants were attempting to collect a debt. ECF No. 13 at 18-19 (citing *Pollard v.*

*Law Office of Mandy L. Spaulding,* 766 F.3d 98, 103 (1st Cir. 2014)). As previously discussed, however, multiple letters and notices sent by the Defendants to Lamprey referred to payments being "due"; cited six-figure dollar amounts that were alleged to be delinquent; threatened acceleration of the loan if payment was not received by a specific date; warned Lamprey that she would be responsible for repaying the cost of a force-placed hazard insurance policy; and identified debt collectors who had been retained by the Defendants for the purpose of collecting a debt. *See* ECF No. 1-8; ECF No. 1-9; ECF No. 1-15; ECF No. 1-20; ECF No. 1-23; ECF No. 1-28; ECF No. 1-55; ECF No. 1-58; ECF No. 1-67. These facts, in addition to the inferences I draw in Lamprey's favor at the motion to dismiss stage, lead me to conclude that Lamprey has plausibly alleged a claim for violation of the federal Fair Debt Collection Practices Act.

## IV. CONCLUSION

A defendant who brings a motion to dismiss must establish that the plaintiff failed to allege a claim that is plausible on its face. *See Iqbal,* 556 U.S. at 678. For the reasons explained above, I conclude that the Defendants have not met this burden, and consequently, their Motion to Dismiss (ECF No. 12) is **DENIED.**

**SO ORDERED.**

**Dated this 11th day of August 2017.**

                                                      **/s/ JON D. LEVY**
                                                **U.S. DISTRICT JUDGE**